[Cite as *Perry v. Davis*, 2013-Ohio-4078.]

IN THE COURT OF APPEALS FOR CHAMPAIGN COUNTY, OHIO

MARLA J. PERRY                          :

    Plaintiff-Appellee                  :                    C.A. CASE NO.    2013 CA 6

v.                                      :                    T.C. NO.    12CV295

DELBERT DAVIS, et al.                   :                    (Civil appeal from
                                                             Common Pleas Court)

    Defendants-Appellants               :

                                        :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   20th   day of    September    , 2013.

. . . . . . . . . .

ROBERT A. WINEBERG, Atty. Reg. No. 0039771, 4 W. Main Street, Suite 723, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

JACOB M. JEFFRIES, Atty. Reg. No. 0078470, 133 S. Main Street, New Carlisle, Ohio 45344
      Attorney for Defendants-Appellants

. . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Delbert and Karen Davis. The Davises and Marla Perry own adjoining parcels of land in Christiansburg, and the Davises appeal from the decision of the trial court which determined the disputed location of the property line between the parties on Perry's motion for declaratory judgment. We hereby reverse the judgment of the trial court.

{¶ 2} By way of background, the record reflects that Perry resides at 21 Pike Street. There is confusion in the record regarding the address of the Davises. We note that in their answer, the Davises admitted that they reside at 19 Pike Street, which is immediately east of 21 Pike Street, but in his testimony, Delbert stated that his address is 17 Pike Street, and that his "second property" is 19 Pike Street. 17 Pike Street is directly east of 19 Pike Street. At issue is the property line between 19 Pike Street and 21 Pike Street. All three properties are situated on the north side of Pike Street, which is perpendicular to Main Street to the east. 19 and 17 Pike Street are within "out lot 43" of the original village of Christiansburg, while Perry's property is immediately west of the original Christiansburg boundary. "In lot" 35 is between the eastern edge of out lot 43 and Main Street. First Street is north of and parallel to Pike Street.

{¶ 3} On September 24, 2012, Perry filed a "Complaint for Declaratory Judgment and Injunctive Relief." According to Perry, the Davises, "began pouring gravel and made other preparations for what appeared to be a driveway and possibly leading to a garage yet to be built." Perry asserted, "based upon the survey of Mark Scholl, Registered Surveyor No. 6599 * * * Defendants' new construction is trespassing upon her property * * * ." Perry asserted that the "proposed construction violates the Christiansburg Building and Zoning Code requiring all new construction to be not less than five (5) feet from the property line."

Finally, Perry asserted, the "survey of Mark Scholl shows a property line discrepancy of approximately two (2) feet at the northeast corner of Plaintiff's property and the northwest corner of Defendant[']s property a[s] to where the correct corner is located. The dispute as to where the property line exists narrows as the line runs from Plaintiff's northeast corner to her southeast corner." Perry sought declaratory relief as to the location of the property line between the parties and to enjoin further construction by the Davises. Perry attached Scholl's survey to her complaint. She also filed a "Motion" for a temporary restraining order "enjoining the Defendants from continuing their construction * * *."

{¶ 4} On September 28, 2012, the Davises filed an Answer, in which they denied that Scholl's survey is accurate, and alleged that a recorded survey by Wallace Lynn Geuy is an "accurate survey for the lot of Defendants, and that the plat appended hereto and incorporated herein as Exhibit B accurately depicts the lot lines of the Plaintiff and Defendants." The Davises admitted that they "poured a concrete pad," and they asserted "that the pad was placed there so that a movable shed could be placed thereon."

{¶ 5} On November 9 and 29, 2012, the court heard the testimony of Geuy, Delbert Davis, Scholl, and Mike Cozad, another surveyor. Geuy testified that he is a professional engineer and licensed professional surveyor, and that he was employed by the Ohio Department of Transportation for 31 years both as an engineer and surveyor. According to Geuy, "every winter for four or five years, I was part of the chief survey crew and responsible for doing the research and actually excavating and identifying the monuments," namely "section corners and quarter corners on the secondary routes" throughout "District 7" in Ohio. He stated that he also performed surveys throughout

Champaign County from 1964 to 1988 on a part-time basis. Geuy stated that subsequent to his 1989 retirement from the State of Ohio, he "was involved with the Simon Kenton Trail between Urbana and Springfield. And that included preparing the plans and doing all the research on the right-of-way to verify the old railroad right-of-way in Clark and Champaign County," on a full time basis. In total, Geuy estimated that he performed 20 to 30 surveys a year, and he stated that he "did considerable research for the subdivision in the south side of Christiansburg about ten years ago."

{¶ 6} Geuy stated that Delbert Davis contacted him in September, 2007 and "asked to have the box monumentation replaced that had been torn out by a tree and stump removal operation across the back of the lot." Geuy stated that he surveyed the Davises' property, and that he verified his survey in August of 2012, after being informed by Delbert Davis that "his neighbor had engaged another surveyor that claimed that they discovered a 2-foot encroachment on the back corner of the lot."

{¶ 7} In the course of his survey, Geuy stated that he "went back to - - actually, I went back when Ohio became a state and to the surveying and methods that were used then." Geuy provided a written summary of his findings which provides in part, "Ohio was the first State to be formed out of the Northwest territory and thus became the location for experimenting with many systems of subdividing public lands." Geuy stated that a copy of the original plat of Christiansburg, which was formerly known as Addison, was recorded on October 18, 1817, 14 years after Ohio became a state. Geuy stated that the initial plat "was just a drawing" that contained "no dimensions and no street ways."

{¶ 8} In completing his survey, Geuy stated that he employed the practices of the

surveying trade. Geuy stated that a transfer of "all of the original plat of Christiansburg," from Robert Smith to James Smith, was recorded in Deed Volume I, page 433, on October 8, 1828. According to Geuy, "this plat does give some insight with the intended size of the lots by indicating in lots that contain one-fourth acre and five perches. Outlots will contain one acre." He stated that a perch is 16 and a half feet. Geuy explained that an acre is comprised of 160 square perches, and a quarter acre is comprised of 40 square perches. He stated that the in lots were comprised of a total of 45 square perches, namely five perches by nine perches, while the out lots were 16 perches by ten perches.

{¶ 9}    Geuy stated that in 1836 "James Smith transferred to A.G. McFarland the southwest corner of Outlot 43, being 25 [perches] from the southeast corner of [in] lot 35, which is the west line of Main Street. And that confirms the lot sizes from Volume I on page 433 of the 16 perches wide plus the 9 perches for the in lot, which equals 25 perches."

{¶ 10}   Geuy noted that on April 8, 1853, the Daniel Howell Addition was recorded, which was comprised of five lots. The record reflects that the Howell addition is also on the north side of Pike Street, west of out lot 43. Geuy stated no "alleys and no streets are shown" between out lot 43 and the Howell addition. Geuy stated that Howell sold lot number one of the addition, the most eastern lot of thereof, to John Collins on March 20, 1968, in Deed Volume 40, page 124. Then, according to Geuy, on April 14, 1874, Howell sold a "10-foot wide access" to Collins. Exhibit F is a copy of the deed for the access, and it provides in part: "Commencing at the north east corner of lot No. One (1) of Howells Addition to the town of Addison, running East ten feete (sic) (10) thence North

fourteen rods[1] thence West ten feete to a stone and thence south fourteen rods to the place of beginning." Geuy stated that the alley extended to First Street.

{¶ 11} Geuy stated that on January 12, 1897, the Craven/Pearson Estate transferred to Lucretia J. Andrews "a tract being 4 rods of the west side of Outlot 43 and also a tract commencing at the southwest corner of Outlot 43 and running west to Daniel Howell's original east line." Geuy noted that "there is no east/west dimensions on that tract between the Outlot 43 and Howell's east line."

{¶ 12} Geuy stated that on "July 23, 1901, deed book 487 John Wilson sold 3.25 acres to Adam Bright. This description makes reference to the 10-foot alley or access that was transferred to John Collins in 1874 and recorded in 1899." Geuy stated that the Wilson and Bright Addition Plat, dated December 18, 1908, recorded January 22, 1909, includes the 3.25 acres, and the "plat shows a 12-foot-and-a-half wide alley between Pike Street and First Street * * * . This is the first time for an alley to be officially platted and recorded in this location. If the east side of the 10-foot access was Howell's east line, then the 12-foot alley shown on the plat creates a 2-foot overlap on the adjoining. And that would be a problem." Geuy stated, "it's my opinion that the 12-foot alley width is an error because Daniel Howell did not hold the 2-foot width in question when his addition was platted." Geuy stated that there are "survey pins along the west side of the alley that were set by - - I can't think of the surveyor's name. I know he was from Miami County." Geuy stated that he located the alley pins.

{¶ 13} When asked if his survey of the Davis property was in compliance with the

---

[1]Geuy stated that the terms "perch," "pole" and "rod" are interchangeable.

prior work done by "Mr. McCullough," a former county surveyor, Geuy responded as follows:

Yes. That's another idiosyncracy of Champaign County. Survey plats for the last 50 years or so have not been recorded as such. I can go to Logan County or Lima County and the original survey, number one plat, is in the plat book there to look at.

You have to go from deed descriptions. And Mr. McCullough worked for the county as a surveyor for years. And when he retired, he brought all of his notes in. The County Engineer's office has probably four file drawers full of notes and plats that he drew. So unless you know the system in Champaign County it's hard to find them. It's hard enough to find them when you do know where to start looking.

{¶ 14} Geuy stated that in the absence of plats, the standards of his business require him to "take into consideration the occupation lines and any previous surveys that have been monumented. Which in this case Mr. McCullough did considerable research according to his notes and set pins going to several adjoining properties." Geuy testified that McCullough's "original plat that is in the file cabinet as well as the deed calls for a wood post at the northeast corner" of 17 Pike Street. According to Geuy, in 2007, he found "remnants of a wood post, which [McCullough's] survey was about 40 years old." Geuy stated that he used an iron "pin I found on the north side of Pike Street and the wood post and staked the deed distances east and west from there for the two lots that Mr. Davis had." Geuy's survey indicates that he found the iron pin at the southeast corner of 17 Pike Street,

8

and that he set an iron pin at the northeast corner of 17 Pike based upon the wooden post.

{¶ 15}  The following exchange occurred:

Q.  Now, subsequent to finding this wood post and using it for reference for your monumentation did you have occasion to - - when it was brought into question, did you have occasion to go back and try to determine all of the thoughts and ideas Mr. McCullough had had when he set that post?

A.  Yeah.  I reviewed that and that's where I run into all this history lesson that I've testified to.

Geuy stated that subsequent to his survey of the Davis property, Paul Clapsaddle surveyed the adjoining property to the east and "used the monuments that I used to set pins on Mr. Davis' lot." Geuy's written summary provides, "I hesitate to disturb, move or change a line that has been monumented, recorded and accepted for many years."

{¶ 16}  Geuy stated that there is an "undetermined strip width" between the original east line of Howell's addition and out lot 43, which is where Perry's property is located. Perry's deed provides as follows:

Commencing at the Southwest corner of Outlot Number 43 in the original plat of the Town of Addison (now the village of Christiansburg, Ohio), running thence West to the original East line; thence North ten rods; thence East to the Northwest corner of the Southwest quarter of said Lot number 43, thence South 10 rods to the place of beginning.

{¶ 17}  Geuy noted that since Perry's lot has no east and west dimension, the only way to determine its metes and bounds is by reference to other monuments that have been

made previously according to "prior monumentation." According to Geuy, "A diligent search of all records has not resulted in a definite east/west dimension for the tract located at 21 West Pike Street. And based on the above summary and testimony of the recorded information and physical evidence I found [in] 2007, and the obvious confusion in the original records, it's my opinion that no encroachment can exist" from the Davises' property to the Perry property. The following exchange occurred:

Q. So, in fact, if there is any doubt as to, by surveying standards, if there is any doubt as to which of these lots would be in question, it would be the Plaintiff's lot and not the Defendant's lot?

A. Correct.

Q. Why is that once again?

A. There is no recorded dimensions for the east/west width for the Plaintiff's lot. In the absence of being able to verify exactly where Howell's original east line was by recorded dimension there is nothing.

{¶ 18} In response to questions from the court, Geuy indicated that it is standard practice in Champaign County to refer to McCullough's notes in the engineer's office, and that McCullough's notes predate Geuy's survey by "about 40 years." Geuy stated that he is certain that the remnants of the wooden post he found "was the post that Mr. McCullough referred to in his survey," although Geuy stated that he does not know who placed the wooden post.

{¶ 19} Scholl testified that he is a licensed professional land surveyor in the State of Ohio. He stated that he became licensed in 1978. He stated that he has been a member of

"the Professional Land Surveyors of Ohio," and that he has "attended numerous conferences and listened to a lot of speakers on the aspects of land surveying, writing legal descriptions, boundary retracement, construction staking, anything that falls within the realm of what a surveyor does."

{¶ 20}    Scholl stated that he surveyed Perry's property at 21 Pike Street in October of 2011, and he identified his drawing of the survey.   Scholl described the process of completing Perry's survey as follows:

* * * We went to the courthouse and retraced her deed, got a copy of her deed, the adjoining deeds, any plats that affected the property, and any other surveys that we could find so we could go out to the field and do our research.

Upon going out into the field, one of our first points of items I do is locate the street right-of-way lines, I'm talking about Pike Street and Main Street.   And the practice that we have adopted over the years is to locate the curb improvement on those two streets because those curb improvements were generally put in by a survey crew or an engineer when they constructed the streets.   Those curbs are typically parallel to one another, and we split - - what we call split the curbs, measure the curb width west of our job and east of our job with our block we are working in so we could be down there close to Main Street in the intersection of Pike Street, then we could create the centerline of those curbs.   We did the same thing on Main Street.

We then create the right-of-way lines for those streets because they

were platted at 60 feet wide and 5 feet wide. That is the best representation I feel as the years of experience that I accumulated that is the best representation of where those street right-of-way lines are.

And these older plats, like Christiansburg * * * most of the pins that are in there are retracement pins from the other surveyors. They're not original pins. * * * When this plat was done in 1817,* * * they used whatever is readily available to them at the time. It was usually wooden stakes to mark the lot corners, and these plats were not developed in a one-year period. They took several years to develop. So the lots kind of got surveyed by maybe this surveyor one year, then two or three years later they might have brought another surveyor in to lay out a few more in this plot.

{¶ 21} Consistent with Geuy, Scholl stated that the line between 21 and 19 Pike Street is the "outer plat boundary of the original plot of Christiansburg." Scholl stated that there is very little information available regarding the original plat. He stated, "You can read through the verbiage of some of the other deeds, and find out that the lots are five poles wide, and I think it's nine poles deep; and they're all parallel * * * to Main Street and Pike Street." Scholl stated that his "job" was to "recreate that outer boundary, first of that plat and then to construct the interior lot lines parallel to those two streets, and that is in my opinion the best way to recreate those lines." Scholl continued, "[o]nce we have done that, then we look to see if there are existing monuments or other surveyor lines in there that would collaborate with that or agree with that, and then I am more than happy to use somebody else's property pins if I think they're set correctly."

{¶ 22}  Scholl further testified as follows:

 * * * And so when we created those lot lines parallel to Main Street and parallel to Pike Street, I don't have a problem with using the front pins that we found in there that were set by Lynn Geuy, but when we set out the parallel side lines to Main Street, those lots rear corners are not in agreement with what Lynn Geuy said.   And so I set new pins, showed, you know, what technically the deed overlap is.   That's what you call that.

{¶ 23}  Scholl, like Geuy, noted that Perry's original deed "has no width on the front or back of her parcel."  He stated that "the correct method in my opinion is to establish the plat of Christiansburg or Outlot 43, the west line of Outlot 43, which by plat definition is parallel with Main Street." Scholl stated that to then calculate the width of Perry's property, "we had to create the alley on the west side of her property."   Scholl stated the Wilson Bright Addition Plat "calls that this is a 12-foot alley.    One of the tax maps shows it as a 12-foot alley, and * * * I guess survey notes I've been told there by Lynn or Bill McCullough, and I didn't see his name on the copy of the notes I have, * * * and each shows that's a 12-foot alley, and Mike Cozad who surveyed the lots up there on First Street and in the Wilson addition, we found his pins and his survey drawings, and he shows that as a 12-foot alley."

{¶ 24}  Scholl testified as follows:

 * * * We created that 12-foot alley based on the Mike Cozad pins and the width of the property owner to the north which is the Zerkle property. The Zerkle property deed says they own 88 feet.   Their lot is 88 feet wide in the front and back. * * *

And so when we created the 12-foot alley using the Cozad pins, that 12-foot alley gave Mr. Zerkel a width on the back of his lot of 89.13 feet. So he has 1.13 feet of surplus that the deed said he should have 88. That's not too bad in there.

When we went back out there to check our survey, when I found out this was going to go to court, we wanted to update our survey, see if anything had changed. Lynn Geuy had set a pin at Marla Perry's northwest corner along the alley where he thinks a 10-foot alley exists measuring from the Mike Cozad pins. If you would use that, then Mr. Zerkle to the north ends up with 90 feet, 90.13 feet. * * * So we had to establish the east line of that 12-foot alley to determine where Marla Perry's property line is along the alley so that the distance between the front of her property and the back of her property that we have shown on this survey is a result of what is left in there. She has * * * what you call junior rights in that versus senior rights that the plat has senior rights, that it was there first.

{¶ 25} Scholl's plat of his survey shows the location of the Cozad pin, and Scholl stated, from that pin, "we measured across to the east 12 feet to create the east side of that 12-foot alley, and then that line was projected down to intersect with Pike Street, then we set a railroad spike there when we did our survey in October of 2011." Scholl noted that Perry's deed provides that from the southwest corner, her property runs west to Daniel Howell's original east line, which he stated is a "pretty vague location. * * * my opinion is it would be the east line of the 12-foot alley." Scholl stated that "the plat that was recorded at the time

kind of overrides that 10-foot access for lot 1 to be used for access to First Street." Scholl further noted his lines running north from the front pins on Pike Street are parallel to Main Street, and that Geuy's lines tilt to the west.

{¶ 26} On cross-examination, when asked why he referred to the alley as a 12-foot alley, Scholl responded, the "platted subdivision of Wilson and Bright addition called that a 12-foot alley. The Cozad surveys that were done up on the First Street area called that a 12-foot alley, and the 1972 Bill Mcullough notes called that a 12-foot alley." He stated that he "used the 12-foot alley to determine the west line only" of Marla Perry's property, and that he did not "use it to determine where her east line is." Scholl stated that the "senior line is the original platted lot line when that plat was recorded in 1815," and that the subsequent divisions within outlot 43 are "subject to a surveyor's interpretation." Scholl stated that he has not done any other surveys in Christiansburg.

{¶ 27} In response to questions from the court, Scholl stated that the "land in dispute between my survey and the Lynn Geuy survey in the back at the rear is 1.78 feet difference, discrepancy or overlap, which amounts to be about 1 foot 9 3/8 inches, and then that tapers down to the same point out front at Pike Street. So it's a tiny triangular piece of ground."

{¶ 28} Finally, Mike Cozad, a professional registered surveyor, testified that he has surveyed the area west of the property at issue, and that the plat he utilized to do so represented the alley to the west of Perry's property as a 12-foot alley. Cozad stated that he reviewed the surveys of Geuy and Scholl. He stated that outlot 43 is rectangular and parallel to Main Street, and that its north and south boundary lines should be parallel to Main Street. On cross-examination, Cozad stated that he used the plat of the Wilson Bright Addition to

Christiansburg to determine the location of the 12-foot alley.

{¶ 29}    The decision of the trial court provides as follows:

* * *

Testimony established that the property line between Plaintiff and Defendants was in dispute.   Surveyors differed on where the property line is. Each surveyor explained his method of survey.   Each survey appears to be valid.

There is no standard of surveying that resolves such a conflict.

The land in dispute is a pie-shaped wedge.

The maximum width of the land in dispute is approximately two feet.

The Court divides the disputed land in half and a new survey shall accomplish that division.   Each side will pay one half of those costs.

The Defendants have poured a concrete pad.   The pad does not violate Christiansburg ordinances. Defendant cannot put a shed or building closer than five (5) feet to the new property line.

{¶ 30}    The Davises assert one assignment of error herein as follows:

"THE TRIAL COURT'S DECISION ORDERING THE DISPUTED LAND TO BE DIVIDED IN HALF BETWEEN APPELLANT AND APPELLEE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 31}  The Davises assert that Geuy's survey "is more credible than Scholl's survey" because Geuy "followed the steps of the original surveyor while Scholl did not." Perry asserts that "[d]ifference in opinion of the surveyors is not unusual.   However, the trial

court had more than enough competent, credible evidence upon which to base its decision. Therefore, the Decision of the trial court is not against the manifest weight of the evidence."

{¶ 32} The standard set forth for manifest-weight-of-the-evidence appellate review in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), applies also in civil cases. *Eastly v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. In applying this standard, the appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), cited approvingly in *Thompkins* at 387.

{¶ 33} As the Davises assert, as "a general rule, the party asserting that the actual location of a boundary line is not the true location has the burden of proving that issue." *See*, *Hamil v. Carr*, 21 Ohio St. 258, 272-72, 1871 WL 58 (1871).

{¶ 34} The Davises rely in part upon *Sellman v. Schaaf*, 26 Ohio App.2d 35, 269 N.E.2d 60 (3d.Dist.1971) and *Sanders v. Webb*, 85 Ohio App.3d 674, 621 N.E.2d 420 (4th Dist. 1993).

{¶ 35} As noted by the Fifth District, "the law concerning the establishment of property boundaries, the propriety of a conducted survey and what priority that survey must be given in relation to prior and subsequent surveys has been extensively discussed in *Broadsword v. Kauer,* (1959), 161 Ohio St. 524, 120 N.E.2d 111 and *Sellman v. Schaaf,*

(1971), 26 Ohio App.2d 35, 269 N.E.2d 60." *State v. Ross*, 5th Dist. Coshocton No. 09-CA-0024, 2010-Ohio-2931, ¶ 42.

**{¶ 36}** As noted in *Broadsword* at 533-35*:*

It is well settled that monuments are of prime importance in settling boundary disputes. The general rule is well stated in 6 Thompson on Real Property (Perm.Ed.), 519, Section 3327, as follows:

"A 'monument' is a tangible landmark, and monuments, as a general rule, prevail over courses and distances for the purpose of determining the location of a boundary, even though this means either the shortening  or lengthening of distance, unless the result would be absurd and one clearly not intended, or all of the facts and circumstances show that the call for course and distance is more reliable than the call for monuments. This rule does not apply when it is evident that the call for a natural object or established boundary line was made under a mistaken belief with reference to the survey. Generally, in determining boundaries, natural and permanent monuments are the most satisfactory evidence and control all other means of description, in the absence of which the following calls are resorted to, and generally in the order stated: First, natural boundaries; second, artificial marks; third, adjacent boundaries; fourth, course and distance, course controlling distance, or distance course, according to cirumstances (sic). Area is the weakest of all means of description. The ground of the rule is that mistakes are deemed more likely to occur with respect to courses and distances than in regard to objects

which are visible and permanent. The reason assigned for this rule is that monuments are considered more reliable evidence than courses and distances. A description by course and distance is regarded as the most uncertain kind of description, because mistakes are liable to occur in the making of the survey, in entering the minutes of it, and in copying the same from the fieldbook. 'Consequently, if marked trees and marked corners be found conformably to the calls of the patent, or if watercourses be called for in the patent, or mountains or other natural objects, distances must be lengthened or shortened and courses varied so as to conform to those objects.' When it comes to courses and distances, the latter yield to the former."

The trial courts of Ohio have long followed the principles announced above as is indicated by the discussion and citations contained in 5 Ohio Jurisprudence, 741 to 748, Boundaries, Sections 38 to 44.

It is also settled that a public street or road or the boundary line of other property may be used as a monument.

It is, however, definitely stated by all authorities that streets, roads, or property lines, which are themselves required to be located, can not be given controlling effect in fixing the boundaries of other lands. 8 American Jurisprudence, 747, Section 4; 11 C.J.S., Boundaries § 5, p. 545.

{¶ 37} As further noted in *Ross*:

* * * In circumstances where a certified surveyor has made a survey of a parcel of land and a plat is made and recorded, the monuments placed or

ascertained, and boundary lines established by such monuments in the survey, are thereafter controlling. *Sellman v. Schaaf*, supra. In a subsequent survey, the re-surveyor should not run new lines, even where the first are full of errors. *Sanders v. Webb* (1993) 85 Ohio App.3d 674, 680, 621 N.E.2d 420, 424. It is the duty of the second surveyor to find where corners were placed, right or wrong, where they can be found, and then relocate the original lines and corners at the places established. *Id*. Only where it becomes impossible for a second surveyor to find where the first boundaries were established in the first survey, does the second survey turn to courses, distances, and still existing monuments to determine the boundaries. *Sellman* supra at 41-42. *Ross*, *id.*

{¶ 38} As this Court has previously noted:

Minimum standards for boundary surveys have been established by the Ohio State Board of Registration for Professional Engineers and Surveyors. See Ohio Adm.Code Chapter 4733-37. The rules in this chapter were adopted based on statutory powers given to the board by R.C. 4733.07. Although authority interpreting the regulations is sparse, one court has held that the minimum boundary standards are "valid rules promulgated pursuant to the Board's implied power." *Satterfield v. Ohio State Bd. of Registration For Professional Engineers & Surveyors* (May 20, 1999), Adams App. No. 98CA670, unreported, 1999 WL 339234, at 6.

Ohio Adm.Code 4733-37-01 indicates that the rules adopted by the

board are "intended to be the basis for all surveys relating to the establishment or retracement of property boundaries in the state of Ohio."

*Green v. Lemarr*, 139 Ohio App.3d 414, 425-26, 744 N.E.2d 212 (2d Dist. 2000).

{¶ 39} Regarding research and investigation, Ohio Adm.Code 4733-37-02 provides:

(A) The surveyor shall consult deeds and other documents, including those for adjacent parcels, in order to assemble the best possible set of written evidence of every corner and line of the property being surveyed.

(B) After all necessary written documents have been analyzed, the survey shall be based on a field investigation of the property. The surveyor shall make a thorough search for physical monuments, and analyze evidence of monumentation and occupation. In addition, the surveyor shall, when necessary, confer with the owner(s) of the property being surveyed.

{¶ 40} "The identity and validity of a given monument, where in question, must be established by a preponderance of the evidence." *Owens v. Haunert*, 137 Ohio App.3d 507, 739 N.E.2d 5 (12th Dist. 2000).

{¶ 41} Geuy and Scholl employed different methods to determine the location of the boundary line between 21 and 19 Pike Street, and the trial court found both methods to be "valid." Geuy deferred to McCullough's 1972 notes, survey and plat, which he described as the course of standard practice in Champaign County, and he located the remnants of a wooden post at the northeast corner of 17 Pike Street, as well as an iron pin on the southeast corner of 17 Pike Street, both of which he found to be controlling as to the western line of 19

Pike Street. He then "staked the deed distance east and west from there for the two lots that Mr. Davis had," namely 17 and 19 Pike Street. Since there is no definitive east/west dimension for Perry's property, Geuy opined that "no encroachment can exist."

{¶ 42} Scholl testified that after referring to deed references and plats affecting Perry's property, he went to the field and created lot lines parallel to Pike Street and Main Street based upon the location of the curbs of those streets. As noted, Guey and Scholl did not dispute the location of the southwest corner of out lot 43, the location of which was further confirmed by Geuy's research. The dispute arose at the northwest corner, where Geuy's lines tilted west of Scholl's based upon the location of the wooden post noted in McCullough's survey.

{¶ 43} Having thoroughly reviewed the testimony of Geuy and Scholl, we conclude that the decision of the trial court to divide the disputed property in half by means of a new survey created a manifest miscarriage of justice. Scholl's survey established the line between 19 and 21 Pike Street without reference to the monument delineated in McCullough's prior survey. In other words, the trial court's decision to arbitrarily divide the disputed wedge of property in half is not supported by the greater amount of credible evidence. The Davises' assigned error is sustained, and the judgment of the trial court is reversed. The matter is remanded with instructions to the trial court to issue an entry consistent with this opinion as it relates to the property line between 19 and 21 Pike Street, finding that Geuy's survey properly established the location of the boundary between the parties.

. . . . . . . . . .

FAIN, P.J., concurs.

FROELICH, J., concurring on reversal and remand, dissenting on terms of remand:

**{¶ 44}** The plaintiffs-appellees alleged that the defendant-appellants encroached on their property. Very experienced and competent surveyors opined on whether there was an encroachment.

**{¶ 45}** A party - in this case the plaintiffs-appellees - that alleges an encroachment has the burden of proof. By dividing the disputed property in half, the trial court did not decide whether the plaintiffs-appellees had met their burden, but rather seemed to fashion what it believed to be an equitable resolution. However well-intended, this was not the prerogative of the finder of fact.

**{¶ 46}** I would reverse and remand for a factual determination as to whether the burden of establishing an encroachment has been met.

. . . . . . . . . .

Copies mailed to:

Robert A. Wineberg
Jacob M. Jeffries
Hon. Nick A. Selvaggio